# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JOHN O'KEEFE,

      Plaintiff,

v.                                Case No. 8:18-cv-01957-T-02CPT

Deputy DARRELL PATTERSON, individually,
Deputy GREG MELITA, individually,
Deputy ZACHARY BRADLEY, individually,
Sheriff RICK WELLS, in his official capacity
as Sheriff of Manatee County,

      Defendants.

_____/

## <u>ORDER</u>

This action concerns an alleged unlawful seizure of an individual and search and trespass to his property during a criminal investigation. The matter comes to the Court on motions to dismiss Plaintiff John O'Keefe's Second Amended Complaint, Dkt. 49, from Defendants Deputy Melita, Dkt. 57, Deputy Bradley, Dkt. 55, and Sheriff Wells in his official capacity as Sheriff of Manatee County, Dkt. 53. Plaintiff has responded to each motion. Dkts. 61-63. On January 18, 2019, the Court dismissed the claims against Defendant Patterson pursuant to a stipulation of dismissal. Dkts. 67, 69. These matters were fully briefed by the parties. On February 8, 2019, the Court took oral argument on the motions to

dismiss, which was originally noticed only as to the counts against Sheriff Wells. The same attorney represents both the Sheriff and the Deputies, and the counts against the Deputies were discussed at the February 8, 2019 oral argument. The parties presented ably at oral argument, and the pro se Plaintiff was prepared and effective. All counts are DISMISSED with prejudice.

## BACKGROUND

According to Plaintiff's Second Amended Complaint, on July 10, 2016 at 8:58 a.m. Deputy Melita responded to a report of vandalism at a Publix in Bradenton, Florida. Dkt. 49 ¶¶ 18-19. Upon Deputy Melita's arrival at Publix, the store manager showed him bullet holes in a rear fence from an unknown shooter. *Id.* ¶¶ 22-23. The bullet holes were not there at 9:00 p.m. the night before. *Id.* ¶ 23. The Publix manager noticed the holes upon his 7:00 a.m. arrival at the store. *Id.* Deputy Melita concluded that the shooting came from behind Publix and he went to the area behind the fence to investigate. *Id.* ¶¶ 24, 33.

Deputies Patterson and Bradley arrived nearby to assist Deputy Melita. *Id.* ¶¶ 32, 35. The Deputies tried to locate each other "for the purpose of trying to find where the shooting may have come from." *Id.* ¶ 35. They were unable to see each other from the backside of Publix's fence and another property, so they proceeded to the next house. *Id.* ¶ 36.

While Deputy Melita remained behind Publix's rear fence, Deputy Bradley "approached the Plaintiff's home from the east and stepped off the public roadway . . . and set foot onto the Plaintiff's private real property and proceeded approximately 71.8 feet along the east-side of the Plaintiff's home (curtilage) to the locked gate of Plaintiff's backyard, which is posted private property and not open to the public." *Id.* ¶ 37. While there, Deputy Bradley "looked into Plaintiff's home at a sharp angle from a hand's length away from the window pane for the purpose of gaining information." *Id.* ¶ 38. He then "fumbled with the locked gate, stood on the gate, causing the brackets, attached to Plaintiff's home that secured the gate post, to snap and break away a chunk of Plaintiff's home (concrete block)[1], resulting in damage to the exterior wall of Plaintiff's home, and made gestures with his hand to signal [Deputy Melita] who was on the backside of Publix's fence looking for [Deputies Bradley and Patterson]." *Id.* ¶ 39.

Plaintiff further alleges that while next to his locked gate, Deputy Bradley looked at Plaintiff's backyard and enclosed porch, which is not visible from the public thoroughfare. *Id.* ¶ 40. The backyard was separated from the Publix fence by a grassy thoroughfare about 25 feet wide with trees obscuring the view. Dkt. 1-2 at 25; *see also id.* ¶ 33. Deputy Bradley then left to the public road and returned

---

[1] In earlier versions of the complaint, this damage was alleged in a less severe manner: the Deputy "stood on the gate, causing damage." Dkt. 1-2 at 26.

with Deputies Melita and Patterson to walk along the westside of Plaintiff's house.

Dkt. 49 ¶¶ 41-42. The Deputies again "peered" into the windows and then the

backyard and enclosed porch. *Id.* ¶¶ 43-45. The Deputies never entered the

backyard or porch. Plaintiff provides in the Second Amended Complaint, the

following photograph of the curtilage where the Deputies allegedly trespassed:



Plaintiff had a guest at his house who both addressed the Deputies and

informed Plaintiff of their presence. *Id.* ¶¶ 47-48. Plaintiff then "exited his

residence and spoke with [the Deputies]." *Id.* ¶ 50. In an earlier version of the

complaint, Plaintiff stated he secured his dogs and exited the house "to confront"

the Deputies. Dkt. 1-2 at 30; Dkt. 3 ¶ 36. Deputy Melita asked Plaintiff whether he

heard any gunshots the prior night, about his whereabouts the prior night, and

whether Plaintiff owned any guns. Dkt. 49 ¶¶ 50-51. Plaintiff "while under no

obligation to answer said questions, was cooperative" and answered the questions.

*Id.* The guest was also present and "participated in the dialogue with [the

Deputies]." *Id.* ¶ 52.

After the encounter, Plaintiff returned inside, and his guest left. *Id.* ¶ 54. The

guest then informed him by phone that the Deputies were still on the premises

continuing to "peer into the windows and standing at Plaintiff's locked gate,

looking into his backyard and enclosed porch area." *Id.* Plaintiff saw them through

his security cameras and a sliding glass door that leads to the enclosed porch and

backyard. *Id.* ¶ 55.

Deputy Melita knocked on the door and, when Plaintiff answered, instructed

Plaintiff to step outside. *Id.* ¶ 56. Deputy Melita "appearing irritated . . . demanded

that Plaintiff provide him with his name and date of birth." *Id.* ¶ 57. When Plaintiff

refused, Deputies Melita and Patterson "stated that it was not a request," and that

"Plaintiff had to provide his name and date of birth, as they were conducting a

criminal investigation." *Id.* ¶¶ 58-59.

At the time, Deputy Melita was within arm's length in front of Plaintiff,

Deputy Bradley within two feet on Plaintiff's left, and Deputy Patterson within two

feet of Plaintiff's right. *Id.* ¶ 60. Deputy Melita "was standing with his arms wide

and hands near his hips, and the hood guard on his weapon holster was disengaged." *Id.* ¶ 61. The Deputies' voices were "authoritative" and "the tone a parent would use with a child so that the child knows he must obey." *Id.* ¶ 62. Deputy Melita demanded Plaintiff's information once more, to which Plaintiff told him "they could call him Jack." *Id.* ¶ 64.

Plaintiff requested the Deputies leave his property, which they ignored at first, reiterating that "they were conducting a criminal investigation." *Id.* ¶ 66. The Deputies eventually left at Plaintiff's explicit command. *Id.*; *see also* Dkt. 1-2 at 31 (Plaintiff said, "to get the f--- off his private property"). The Deputies never entered Plaintiff's house or attempted to. Nor did they touch Plaintiff or any chattel other than the unopened gate.

While leaving, Deputy Melita recorded the license plate number of a vehicle at Plaintiff's house. *Id.* ¶ 67. He later ran a check on the tag number to obtain the owner's information, and then ran checks on Plaintiff's information. *Id.* ¶¶ 68-70. Shortly after the Deputies' departure, a marked patrol car parked next to Plaintiff's residence for thirty minutes. *Id.* ¶ 72.

Deputy Melita's incident report noted that Plaintiff's residence was "the only home consistent with the [bullet] trajectory," but there was "no evidence to support a PCA or capias" of Plaintiff. *Id.* ¶ 73. In a property and evidence receipt

for the bullet fragments, Deputy Melita named Plaintiff as the subject/defendant. *Id.* ¶ 75.

Plaintiff brought the following claims against the Deputies and Manatee County Sheriff's Office: unlawful search and seizure in violation of the Fourth Amendment against Deputy Patterson (Count I), Deputy Melita (Count II)[2], and Deputy Bradley (Count III); trespass against Deputies Patterson, Melita, and Bradley (Count IV); failure to intervene under 42 U.S.C. § 1983 against Deputy Melita (Count V) and Deputy Bradley (Count VI); failure to adequately train under § 1983 against Sheriff Wells for damages (Count VII) and for injunctive relief (Count VIII); and declaratory and injunctive relief against all remaining Defendants (Count IX). Dkt. 49. Defendants raise a number of arguments in support of dismissal.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). In considering the motion, the court accepts all factual allegations of the complaint as true and construes them in the

---

[2] Unlike Counts I and III, Count II against Defendant Melita is styled as only "Unlawful Search in Violation of the Fourth Amendment." Dkt. 49 at 20.

light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted).

Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted). Courts may also consider documents attached to a motion to dismiss if they are (1) central to the plaintiff's claim; and (2) undisputed or, in other words, the "authenticity of the document is not challenged." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citations omitted).

## DISCUSSION

The Court will handle each of Plaintiff's claims in turn. Dismissal is appropriate for all claims.

### I.     Unlawful Search and Seizure

Plaintiff brings claims for Fourth Amendment violations under § 1983, which requires a plaintiff to prove that (1) the defendants' conduct violated a constitutional right, and (2) the challenged conduct was committed "under the color of state law." *Melton v. Abston,* 841 F.3d 1207, 1220 (11th Cir. 2016) (citation omitted). In response, the Deputy Defendants invoke qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).

A government official "asserting this defense bears the initial burden of showing that he was acting within his discretionary authority." *Moore v. Sheriff of Seminole Cty.*, No. 17-14779, 2018 WL 4182120, at *2 (11th Cir. Aug. 30, 2018) (citation and quotation marks omitted). Plaintiff first argues that, though "a search and seizure" is part of their "job-related powers and responsibilities," Deputies Melita and Bradley have not shown they were acting within their discretionary authority and "executing that job-related function . . . in an authorized manner." Dkts. 62 at 5, 63 at 5. The Court is not persuaded. *See Moore*, 2018 WL 4182120, at *2 (finding it "clear that the officers were acting within their discretionary authority" in investigating reports of criminal behavior at residence).

Thus, to overcome the Deputies' qualified immunity, Plaintiff has the burden to show that (1) the Deputies' conduct violated a constitutional right, and (2) the right was clearly established at the time of the Deputies' alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson*, 555 U.S. at 236 (courts free to address inquiry in most appropriate order).

Qualified immunity allows government officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation." *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009) (citation omitted). The

Eleventh Circuit teaches that qualified immunity should be addressed "as early in the lawsuit as possible" because it is a defense not only from liability, but from suit. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

1. In a light most favorable to the claim, there was no unconstitutional seizure.

The Deputies did not unlawfully seize Plaintiff during either the initial or subsequent encounter. An individual is seized for Fourth Amendment purposes if, "in view of all the surrounding circumstances, a reasonable person would believe that he was not free to leave." *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991) (citations omitted). In so deciding, a court can consider many factors, such as whether a citizen's path is blocked or impeded; whether identification is retained; "the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police." *United States v. Puglisi,* 723 F.2d 779, 783 (11th Cir. 1984) (citations omitted).

Both encounters occurred immediately outside of Defendant's home. Not only this, but they appear to have taken place at his front door. Though the three Deputies were positioned on each side of him, there is no allegation that any blocked Plaintiff's egress to his house. No identification was retained, though during the second encounter the Deputies did demand Plaintiff's name and date of

birth. This is not dispositive. *See De La Rosa*, 922 F.2d at 678 (finding no seizure despite police retention of license); *Golphin v. State*, 945 So. 2d 1174, 1187-88 (Fla. 2006) (no seizure where license retained to run warrants check).

Based on the content of Plaintiff's pro se complaint and his presentation at oral argument, the Court finds that Plaintiff is a highly intelligent adult. The police questioning itself was rather general and there is no allegation it lasted longer than minutes. During the first encounter, Plaintiff was "cooperative." While the Deputies were physically close, they were not touching Plaintiff. And though the hood guard on Deputy Melita's gun was alleged to be disengaged, no firearms were drawn. Additionally, Plaintiff's guest was not only present but also "participating" during the entire first encounter. Plaintiff was thus not isolated from his guest.

The fact that the Deputies continued to investigate after the initial conversation does not by itself convey to a reasonable person that he is not free to leave. Nor does the forceful tone the Deputies might have used. When Plaintiff clearly asked the Deputies to leave, they complied, though perhaps not on the first request. At any time before this, a reasonable person would have felt he could simply turn around and reenter his house.

Accordingly, there was no seizure. Because of this finding, the Court need not determine whether reasonable suspicion existed to detain Plaintiff or whether the Deputies violated a clearly established constitutional right.

2. In a light most favorable to the claim, qualified immunity protects the Deputies for any search of Plaintiff's property.

"[S]earches . . . inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citation omitted). Curtilage, "the area immediately surrounding and associated with the home," is "part of the home itself for Fourth Amendment Purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation and internal quotation marks omitted).[3] "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred," which is "presumptively unreasonable absent a warrant." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (citation omitted).

For the Court to find a warrantless entry constitutional, the police bear the burden of proving probable cause and exigent circumstances. *Payton v. New York*, 445 U.S. 573, 589 (1980). Probable cause exists where the circumstances would lead a reasonably cautious person to believe that a search will disclose

---

[3] The Deputies do not dispute that Plaintiff's side yards, immediately adjacent to the home, constituted curtilage. *See United States v. Dunn,* 480 U.S. 294, 301 (1987) (finding relevant factors for curtilage include the proximity of the area to the home, whether the area is enclosed, the nature of uses to which the area is put, and whether any steps had been taken by the resident to protect the area from passers-by).

evidence of a crime. *United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir. 1983) (citation omitted). Exigent circumstances are found where an urgent need for immediate action outweighs the necessity of obtaining a warrant. *Id.* at 1526. Examples include the need to "prevent the imminent destruction of evidence" and the emergency aid exception. *Brigham City,* 547 U.S. at 403 (citations omitted). Here, no evidence was found.

This case is different from criminal prosecutions where evidence may be suppressed. Rather than suppression, Plaintiff seeks money from the Deputies as his remedy. In this context, "when the claim is that a search . . . violated the Fourth Amendment, qualified immunity depends upon whether arguable probable cause existed." *Fish v. Brown*, 838 F.3d 1153, 1167 (11th Cir. 2016) (citation and alteration omitted). "*Arguable* probable cause exists if, under all of the facts and circumstances, an officer reasonably *could*—not necessarily *would*—have believed that probable cause was present." *Id.* (citation omitted) (emphasis in original). The Deputies had at least arguable probable cause to suspect that evidence of the shooting would be found on Plaintiff's premises, and there were exigent circumstances to justify the entry.

Plaintiff alleges the Deputies walked along the east and west sides of his house, peered into the windows without touching them, and viewed the enclosed porch and backyard from a locked fence. He further alleges that "no-trespassing"

and "private property" signs were posted. Looking at the photograph in the Complaint of the area at issue, the Court notes the path along the side of the house is grassy and a fair distance from the public road or any sidewalk. Dkt. 49 at 9. Based on the allegations, this is curtilage.

An officer reasonably could have believed that evidence of the crime—for example, discharged cartridges from the fired bullets—would be found on Plaintiff's property. Deputy Melita concluded Plaintiff's house "was the only home consistent with the trajectory." Dkt. 49 ¶ 73. This, coupled with the relative recency of the shooting and negligible intrusion, is sufficient.

Having found arguable probable cause, the Court turns to exigent circumstances. According to the Deputies, "[a] reasonable officer could have believed that [their] actions were lawful as there could have been an injured person in one of those three yards or for the general safety of the public." Dkt. 59 at 7. As investigators of a very dangerous shooting, the Deputies were looking for bullet cartridges, or "brass," that most guns used in street crimes now emit. Semi-automatic pistols are the common handgun now seen in crimes. They spew small brass cartridges when fired.

"In determining whether agents reasonably feared imminent destruction of the evidence, the appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe

that evidence might be destroyed before a warrant could be secured." *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990) (citations omitted). Bullet cartridges are small, and in a crime scene are evanescent—meaning, they are very likely to disappear if the perpetrator can pick them up before the police. The Deputies were responding to a shooting into a shopping center. Deputy Melita's estimated timeframe of the events suggested shots were fired from anywhere from two to ten hours of his arrival on the scene, from Plaintiff's home. The Plaintiff's timeline was that, at the freshest, the bullet holes were two hours old. A reasonable officer investigating a shooting into a shopping center in the last 120+ minutes might well want to locate the spent and scattered brass, which can carry fingerprints and DNA.

The question under qualified immunity is whether no reasonable officer would have conducted themselves in the manner of these Deputies given: a fairly recent multiple shooting into a shopping center, Deputy Melita's determination that the backyard of only one house was within the line of trajectory, and a view into that backyard that was obscured by trees. Walking along the side curtilage to look for evidence like strewn brass in the backyard is not so clearly in violation of constitutional law to be actionable for money damages against the Deputies.

Again, this is not a criminal case where evidence may be suppressed. This is akin to a constitutional tort. These facts are a far cry from bringing a drug-sniffing dog on a suspect's front porch or other "unlicensed physical intrusion[s]."

*Jardines*, 569 U.S. at 7. Rather, a police investigation led Deputies to one residence of initially three where a reasonable officer could have believed probable cause existed for evidence of a crime and that potentially two exigencies justified expedited action.[4]

The Court finds that qualified immunity protects the Deputies from their alleged unlawful search. Nothing was taken in the brief episode, no one was touched, nor any structure entered. It is hard to overestimate the danger of someone firing multiple times into a Publix shopping center. The Deputies did not so exceed their discretionary authority that they should pay tort damages for their acts in looking for the shooter.

In investigating a shooting into a shopping center, our society has an interest in these Deputies immediately trying to find the shooter, or the shooter's nest. Although Plaintiff was inconvenienced, our need for a swift investigation protects the Deputies "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). "As the Supreme Court has emphasized, a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into

---

[4] Though the Court need not reach the question, even if there were a violation, cases like *United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002) and *United States v. Timmann*, 741 F.3d 1170 (11th Cir. 2013) suggest that the law on at least the emergency aid exception was not clearly established at the time of the search.

an occasion for constitutional review." *Montanez v. Carvajal*, 889 F.3d 1202, 1211 (11th Cir. 2018) (citation and quotation marks omitted).

II.  Trespass

Plaintiff next argues that when the deputies entered onto his land that was posted "Private Property – No Trespassing," they violated "Florida Law, including Fla. Stat. §810.09, Art. 1, Sec. 23, Fla. Const., and Plaintiff's fundamental constitutional rights guaranteed by the United States Constitution." Dkt. 49 ¶ 162. Defendants respond that Plaintiff improperly sues under a criminal provision. The Court, however, need not resolve whether the complaint contains a well-pleaded claim of civil trespass because sovereign immunity protects the Deputies in their individual capacities against state law tort claims.

Florida's sovereign immunity statute provides that "[n]o officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . ." Fla. Stat. § 768.28(9)(a).

Bad faith and malicious purpose require actual malice, or in other words, a showing of "ill will, hatred, spite, or an evil intent." *Barnett v. MacArthur*, No. 6-

15-CV-469-ORL-18DAB, 2016 WL 10653677, at *2 (M.D. Fla. Jan. 28, 2016) (citations omitted). "[F]or conduct to be willful and wanton, it must be shown that the defendant knew, or reasonably should have known . . . , that his conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences." *Id.* (citations and modifications omitted). A constitutional violation does not, by itself, satisfy this. *Montanez v. Carvajal*, No. 6-15-CV-807-ORL-40DAB, 2016 WL 231213, at *4-5 (M.D. Fla. Jan. 15, 2016); *cf. Eiras v. Fla.*, 239 F. Supp. 3d 1331, 1344-45 (M.D. Fla. 2017) (lack of probable cause insufficient for actual malice).

In *Montanez*, for example, officers who suspected a burglary in progress conducted a search of a home, remained there for more than six hours while waiting for the issuance of a search warrant, and then reentered. 2016 WL 231213, at *1. The court noted that, though allegations permitted the "reasonable inference that [the officers] lacked a warrant or exigent circumstances to initially enter and search [the] home," the court could not "reasonably infer that [the officers] acted in bad faith, with malicious purpose, or with a wanton and willful disregard of human rights, safety, or property." *Id.* at *4-5. The court did not credit the plaintiffs' legal

conclusions of malice, and ultimately granted the motion to dismiss on trespass with prejudice. *Id.* at *5.[5]

Similarly, in *Black v. Wigington*, 811 F.3d 1259 (11th Cir. 2016), the Eleventh Circuit overruled a district court's denial of official immunity at summary judgment. The deputies had entered a trailer owned by two individuals and found contraband. *Id.* at 1263. In a subsequent prosecution the superior court suppressed the evidence from the trailer, finding that, though a screen near the handle of the door was cut in a manner consistent with burglary, and the door was unlocked, no exigent circumstances justified the entry. *Id.* at 1264-66. In a civil suit for trespass against the deputies, the Eleventh Circuit agreed that the deputies' assessment of the circumstances might have been "misguided or even reckless, but that kind of conduct does not give rise to an inference of actual malice under Georgia law." *Id.* at 1266 (citation and quotation marks omitted); *see also Maughon v. Bibb Cty.*, 160 F.3d 658, 661 (11th Cir. 1998) (affirming immunity for alleged trespass in Georgia because plaintiffs "presented no proof that the defendants acted with intent to cause them harm").

---

[5] The court's decision was later amended on a separate issue on a *sua* sponte reconsideration in *Montanez v. Carvajal*, No. 6-15-CV-807-ORL-40DAB, 2016 WL 10537042 (M.D. Fla. Feb. 3, 2016), and is on appeal. The appellate court also ruled on the case as it relates to qualified immunity. *Montanez v. Carvajal*, 889 F.3d 1202, 1210 (11th Cir. 2018). The appellate court's holding, "that police investigating what they reasonably believe to be a residential burglary (whether ongoing or recently concluded) may conduct a limited warrantless search of the house to look for potential suspects and victims," *id.*, is consistent with the analysis of the instant case.

Though this case concerns Florida's sovereign immunity statute, the facts as alleged compel a similar disposition. Even if the Deputies' actions constituted a civil trespass, the Deputies' acts were within the scope of their employment. They were investigating a crime and, based on the apparent trajectory of the bullets, that investigation led them to Plaintiff's residence. And even if that search were "misguided" or "reckless," there is no factual allegation, apart from conclusory statements, that supports a finding of bad faith or malicious purpose or a wanton and willful disregard of human rights, safety, or property. There were, for example, no threats or coercion related to the search as in *Callahan v. City of Hollywood*, No. 14-CIV-62960, 2015 WL 13638849, at *7 (S.D. Fla. Dec. 28, 2015), no allegation of a fabricated police report,[6] *Claridy v. Golub*, 632 F. App'x 565, 571-72 (11th Cir. 2015), or any other relevant behavior apart from the alleged trespass itself.

This is in contrast to the more serious allegations of *O'Hare v. Town of Gulf Stream*, No. 13-CV-81053, 2015 WL 12977393 (S.D. Fla. June 22, 2015). That court denied sovereign immunity based on the plaintiff's allegations that an official "went inside his house without consent or a warrant," ignored warnings not to enter, and said nothing as he walked into the residence "over the continued verbal

---

[6] The Court does not deem Deputy Melita's naming of Plaintiff as "subject/defendant" on the Property and Evidence Receipt as relevant. First, the report is only tangentially related to the injury complained of—the unlawful search and trespass. Secondly, for the reasons discussed related to bullet trajectory, Plaintiff was indeed the subject of a brief criminal investigation.

objections." *Id.* at *1, 13. The official then entered a "private, fenced off area" of the adjacent property, also owned by the plaintiff, and photographed the backyard of the residence over a six-foot privacy fence. *Id.* at *1; *see also Thomas v. City of Palm Coast*, No. 3:14-CV-172-J-32PDB, 2015 WL 7429051, at *1 (M.D. Fla. Nov. 23, 2015) (denying immunity at motion to dismiss stage where defendants allegedly stayed on private property for more than two hours, took photographs of the inside of a living room window, and walked into a side yard to look into and photograph a fenced backyard).

This case is moreover distinguishable from *Moore v. Eger*, No. 6-16-CV-303-ORL-28GJK, 2017 WL 6367598 (M.D. Fla. Oct. 20, 2017). *Moore* involved a police response to a report of fighting at a home. *Id.* The officers allegedly trespassed into a home even though they were told the fighting individuals had left and the owner initially refused to let them enter, "stating they needed a warrant." *Id.* at *2. The court denied summary judgment on immunity because the "question whether a state officer acted with malice is not appropriately resolved at summary judgment when material facts are contested," such as whether the owner consented and "why [the officer] entered the home." *Id.* at *6.[7]

---

[7] The U.S. Court of Appeals for the Eleventh Circuit heard appeal on a separate issue of the case, noting that the trespass claim was "not resolved by our conclusion that the officers lacked exigent circumstances to enter [the] apartment without a warrant because Florida law provides officers with immunity from suit unless the officers 'acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.'" *Moore*, 2018 WL 4182120, at *4 (citation omitted).

Again, there is no allegation that the officers entered Plaintiff's curtilage for any reason other than to investigate the shots fired at Publix. Deputy Melita's deduction based on the trajectory of the bullets—the existence of which is not contested by Plaintiff—led the Deputies to Plaintiff's residence as the source. Dkt. 49 ¶ 73. While there, the Deputies did not behave with the intent requisite to face individual liability. Sovereign immunity protects the Deputies from the state law trespass claim.[8] Count IV is dismissed.

III.    Failure to Intervene

Plaintiff's claims of failure to intervene against Deputies Melita and Bradley also fail. Plaintiff argues that Deputy Melita "observed and stood by idle as [Deputies Patterson and Bradley] violated and deprived Plaintiff of his constitutional rights to be secure in his persons, houses, papers, and effects, against unreasonable searches and seizures pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and failed to intervene." Dkt. 49 ¶ 178. He further complains that Deputy Bradley acted similarly by failing to intervene in the violations of Deputies Melita and Patterson. *Id.* ¶ 186.

Even assuming there was an unconstitutional search and that the failure to intervene doctrine covers such conduct, there was no clearly established law on

---

[8] Yet this is the extent of the statute's protection. Florida's sovereign immunity does not extend to the claims under federal law, *e.g.*, the alleged search in violation of the Fourth Amendment. *See Homonai v. City of Fruitland Park*, No. 5:16-CV-610-OC-30PRL, 2017 WL 1495806, at *5 (M.D. Fla. Apr. 26, 2017) (citations omitted).

this point at the time of the alleged violation. Indeed, courts in the Eleventh Circuit have repeatedly noted it is unclear whether this "bystander" liability exists outside of the excessive force context. *E.g.*, *Kelley v. City of Fairfield, Ala.*, No. 2:13-CV-01012-MHH, 2015 WL 4229872, at *4 n.5 (N.D. Ala. July 13, 2015); *Tarantino v. Citrus Cty. Gov't*, No. 5:12-CV-434-OC-32PRL, 2014 WL 4385550, at *14 (M.D. Fla. Sept. 4, 2014); *Roddy v. City of Huntsville, Ala.*, 947 F. Supp. 2d 1271, 1300 (N.D. Ala. 2013), *aff'd*, 580 F. App'x 844 (11th Cir. 2014); *Mehta v. Foskey*, 877 F. Supp. 2d 1367, 1380-81 (S.D. Ga. 2012). Plaintiff sets forth no decision from the U.S. Supreme Court, U.S. Court of Appeals for the Eleventh Circuit, or the Florida Supreme Court that "clearly establishes that a non-supervisory officer's failure to intervene to prevent another officer's unconstitutional conduct violates a person's constitutional rights outside the excessive force context." *Rance v. Bradshaw*, No. 15-CV-81210-KAM, 2016 WL 3199002, at *9 (S.D. Fla. June 9, 2016).

Qualified immunity shields Deputies Melita and Bradley from Plaintiff's failure to intervene claims. Counts V and VI are therefore dismissed.

IV.    Failure to Train

Plaintiff also brings a § 1983 claim against Sheriff Wells under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Because Plaintiff sues Sheriff Wells in his official capacity, the claim is effectively against the

Manatee County Sheriff's Office. *Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010).

A municipality may be liable upon a "failure to train or supervise" theory "only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1349 (11th Cir. 1998). A plaintiff "may prove a city policy by showing that the municipality's failure to train evidences a 'deliberate indifference' to the rights of its inhabitants." *Id.* (citation omitted). To do so, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action," such as "a history of widespread prior abuse." *Id.* (citations omitted).

Even assuming Plaintiff's constitutional rights were violated, his complaint lacks allegations of a custom or policy constituting deliberate indifference to the rights enshrined in the Fourth Amendment. In his Complaint, he alleges only one prior incident where "deputies and detectives unlawfully entered a home without a warrant or exception to the warrant requirement." Dkt. 49 ¶ 213. That event resulted in a not-sustained finding. *Id.* This is not enough. *See Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 942-43 (11th Cir. Jan. 13, 2017) (per curiam) (finding that two prior incidents are insufficient to support a failure to train theory

against a county); *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1053 (11th Cir. 2014) (one prior incident insufficient).

In his response to the motions to dismiss, Plaintiff relies upon the single-instance theory for failure to train in *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). Dkt. 61 at 4-5. As noted by the U.S. Supreme Court, "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (citation and quotation marks omitted). This may exist where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. The Court in *Canton* looked to deadly force training as an example:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10.

In the Eleventh Circuit, a "single instance of unconstitutional conduct can create *Monell* liability only when proof of the incident includes proof that it was caused by an existing unconstitutional municipal policy, which policy can be

attributed to a municipal policymaker." *Martin v. City of Macon Ga.*, 702 F. App'x 941, 944 (11th Cir. 2017) (citation and quotation marks omitted); *see also Denham*, 675 F. App'x at 942 (deciding not to extend single-incident theory to situation not analogous to deadly force); *Keith*, 749 F.3d at 1053 n.56 (same); *Gold*, 151 F.3d at 1352 (same).

The Court finds that, as with *Martin*, *Denham*, and *Gold*, the allegations here "fall[] far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city." *Gold*, 151 F.3d at 1352. Count VII is dismissed.

In Count VIII, Plaintiff purports to bring a failure to train claim for injunctive relief, requesting the Court to, *inter alia*, "conduct an internal investigation of the matter set forth herein" and "prepare and implement an enforceable comprehensive remedial plan, including specific dates and benchmark targets, to train/educate Deputies on the Fourth and Fourteenth Amendments pursuant to the United States Constitution . . . ." Dkt. 49 at 56. But this falls alongside Count VII. *See GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1302 (M.D. Fla. 2015) (citation omitted) ("[I]t is well-established that injunctive relief is not a proper claim for relief in and of itself, but rather a remedy that is available upon a finding of liability of a claim.").

V.    Declaratory and Injunctive Relief

The final count is titled "Declaratory and Injunctive Relief" and is against all Defendants. Plaintiff requests the Court to command Sheriff Wells to "take appropriate law enforcement action against his deputies that commit the offense of trespass" and seeks to obtain "a declaration of rights, status, or other equitable or legal relations under [section 810.09, Florida Statutes]." Dkt. 49 ¶ 265. Plaintiff is himself "in doubt" as to whether this is legally enforceable. It is not.

The Court has no power to command Sheriff Wells to "take appropriate law enforcement action against" the deputies for several reasons. Most fundamentally, "a private citizen has no judicially cognizable interest in the prosecution or non-prosecution of another." *Otero v. U.S. Attorney Gen.*, 832 F.2d 141, 141 (11th Cir. 1987); *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 379-82 (2d Cir. 1973) (affirming the dismissal of a complaint seeking the investigation and prosecution of persons who allegedly violated federal and state criminal statutes).

Secondly, a court "may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to

the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). No element is satisfied here.

As for his request for declaratory judgment, Plaintiff cites Florida's Declaratory Judgment Act. The Act "is a procedural mechanism that confers subject matter jurisdiction on Florida's circuit and county courts; it does not confer any substantive rights." *Coccaro v. Geico Gen. Ins. Co.*, 648 F. App'x 876, 880-81 (11th Cir. 2016) (citations omitted). Even putting this aside, there is still no grounds for declaratory judgment. In the absence of an imminent criminal charge or prosecution, a declaratory judgment action to determine the construction or validity of a criminal statute lacks a justiciable controversy. *Treasure Chest Poker, LLC v. Dep't of Bus. & Prof'l Regulation, Div. of Alcoholic Beverages & Tobacco*, 238 So. 3d 338, 341 (Fla. 2d DCA 2017). Though this case concerns the applicability, or lack thereof, of a criminal statute instead of its validity, a declaration is still inappropriate. Count IX is dismissed.

## CONCLUSION

The Court **GRANTS** Defendants' motions to dismiss. Dkts. 53, 55, 57. This is Plaintiff's third complaint. A fourth attempt would be futile. The Court dismisses with prejudice all claims in Plaintiff's Second Amended Complaint. Dkt. 49. The Clerk is directed to terminate all pending motions and close the case.

**DONE AND ORDERED** at Tampa, Florida, on February 15, 2019.


/s/ *William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record
Pro se parties